UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------x

UNITED STATES OF AMERICA,

- v. -

JOSHUA STREIT,
a/k/a "Josh Brody,"

Defendant.

---------------------------------------------------X

22 Cr. 350 (ALC)

**GOVERNMENT'S SENTENCING MEMORANDUM**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
Attorney for the United States of America

Dina McLeod
Assistant United States Attorney

- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------x

UNITED STATES OF AMERICA,

- v. -

JOSHUA STREIT,
a/k/a "Josh Brody,"

Defendant.

---------------------------------------------------X

22 Cr. 350 (ALC)

**GOVERNMENT'S SENTENCING MEMORANDUM**

For years, the defendant operated a website which illegally streamed copyrighted content—primarily livestreamed for-profit sporting events from major professional sports leagues, including MLB, the NBA, the NFL and the NFL (collectively the "Sports Leagues"). The defendant obtained the copyrighted content by illegally accessing the websites for the Sports Leagues via the unauthorized use of login credentials belonging to legitimate users of those websites.

To reflect the seriousness of the defendant's conduct, to promote just punishment and respect for the law, and to deter the defendant and others like him, the Government respectfully requests that the Court impose a sentence within the Stipulated Guidelines Range of 51 to 60 months' imprisonment, which would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

## I. THE OFFENSE CONDUCT

The defendant engaged in a years-long, sophisticated scheme to access the accounts of innocent individuals without authorization and to use that access to illegally stream copyrighted content for profit. The record also contains evidence of the defendant's attempt to extort one Sports League by threatening to publicize a vulnerability in its computer network.

**1. The Major League Baseball Website**

Major League Baseball ("MLB") streams its baseball games (the "Streamed Games") on its website (the "MLB Website"). MLB holds the copyright to the public performance of the Streamed Games, the majority of which are livestreamed on the MLB Website. b.Users can purchase a subscription from MLB to view the Streamed Games. Those subscriptions cost approximately $129.99 in the 2021 season.

In order to stream a game on the MLB Website, the user must login with a username and a password. Once the user has logged into the MLB Website, he or she can navigate to the desired game and click on the streaming icon to watch that game.

**2. The Illicit Streaming Website**

From at least 2017 through August 2021, the defendant operated, and profited from, the website Hehestreams.com (the "Illicit Streaming Website"). The Illicit Streaming Website offered to the public streaming services for MLB, NBA, NFL and NHL sporting events. The Illicit Streaming Website offered these services for a price. For example, the Illicit Streaming Website offered unlimited streaming of a full season of MLB games for $100 annually. The Illicit Streaming Website was never authorized by the Sports Leagues to stream any copyrighted content.

The defendant knew that he was "steal[ing]" content. In a message on the social media platform Discord, the defendant complained that the NBA had increased its online security and needed help finding a "solution." The defendant wrote, "If you have any expertise with CDNs, scraping,[1] or sketchy shit, I'd love to talk to you. Please reach out to me via any channel." An undercover FBI agent responded to the defendant. In the ensuing conversation, the defendant said,

---

[1] "Scraping" refers to the downloading of large quantities of data or content (typically from a website) by automated bots. Scraping is often used to repurpose content for malicious purposes.

among other things, "[E]verything is streamed straight from nba league pass's cdn" and "[I] have a set of backup feeds right now. [T]hey're okay **but i'd like to continue doing my 'steal from nba league pass shit' as I have for the last 5 years**." (emphasis added).

In addition, the defendant was interviewed anonymously for an article ("Article-"1) published in an online technology publication on or about March 8, 2021. Article-1 contains quotes from the "owner" of the Illicit Streaming Website who, the article notes, "understandably wishes to remain anonymous, because he offers pirated access to four major sports leagues." According to the "owner," he runs "pretty much everything—the tech, the maintenance, and the social media accounts—all by himself." The "owner" stated that "he founded the site in 2016 and went 'premium," by which he means he started charging money for access, in the fall of 2018."

Also according to the "owner," he has "devised a way to redirect the official content distributed by the sports leagues through his own server. 'I reverse-engineer the official services and give you their platform,' he explains.'" The "owner" also stated "that he has to have an 'army' of different active streaming accounts to keep the content flowing." Article-1 notes "[The Illicit Streaming Website] is breaking all sorts of copyright laws, which explains how it offers one of the best deals on the market."

**3. The Defendant's Unauthorized Access to the Accounts of Innocent MLB Website Users**

As the investigation uncovered, the "reverse engineering" described by the defendant in Article-1 was simply a euphemism for breaking into the accounts of legitimate content subscribers.

In order to obtain the copyrighted content for the Illicit Streaming Website, the defendant logged into other people's MLB accounts, without permission. For example, an analysis of the MLB account of a particular subscriber in Texas (the "Subscriber-1 Account") indicated that, between March 2019 and August 2021, the defendant had logged into the subscriber's account

approximately nine times from his own residential IP address.[2] In addition to those nine log-ins, that same account was also logged into using various IP addresses (many of which logged in multiple times to the Subscriber-1 Account within short intervals of time) which resolved to locations abroad. Subscriber-1 confirmed that he had never shared his MLB website username and password with anyone and had never authorized anyone else to use the Subscriber-1 Account.

As described in the PSR, the defendant compromised the accounts of innocent MLB Website users in order to steal an access token that allowed him to stream the copyrighted content directly from the third-party service hosting the content. (PSR ¶¶ 25-27).

**4. The Extortion Attempt**

While the defendant was breaking into MLB user accounts and stealing MLB content, he also attempted to extort the MLB by threatening to expose a vulnerability in their computer networks.[3]

In or about March 2021, the defendant emailed an MLB employee ("MLB Employee-1"), noted that he had earlier notified MLB of a particular network vulnerability, and complained that the "lack of gratitude [from MLB] is frankly shocking." The defendant also asked to be put in touch with MLB's senior information technology personnel. MLB Employee-1 responded, among

---

[2] An Internet Protocol ("IP") address is a numerical label assigned to each device participating in a computer network that uses the Internet Protocol for communication. IP addresses serve to identify particular devices on a network and to allow information to be routed to and from those devices.

[3] The network vulnerability identified by the defendant to MLB was not the same vulnerability that allowed the defendant to illegally steal copyrighted content.

other things, "I'll see what I can do" about putting STREIT in touch with MLB information technology personnel.

The defendant then replied to MLB Employee-1 in another email, writing that he had reported other vulnerabilities "over the weekend." He also noted that he had two reporters who cover MLB ("MLB Reporters") "interested in the story." MLB Employee-1 informed an MLB Executive ("MLB Executive-1") that the defendant wanted to speak to one of MLB's information technology personnel about a network vulnerability.

MLB Executive-1 called the defendant. During this phone call, the defendant was upset that his efforts had not been adequately acknowledged by MLB. The defendant also told MLB Executive-1 that he wanted to be financially compensated for reporting the network vulnerability. MLB Executive-1 informed the defendant that MLB does not have a "bug bounty" program[4] but that MLB appreciated his efforts. The defendant then told MLB Executive-1 that MLB should have a bug bounty program for situations like this and that it would be bad if the media found out about the network vulnerability and embarrassed MLB.

On or about September 28, 2021, the defendant emailed MLB Executive-1, writing that he "was hoping to return to our conversation from March." The defendant noted that he "recall[ed] being prompt, forthcoming, available, and professional" when notifying MLB and hoped that "the same courtesy is returned and warranted." The defendant also wrote that he had not "followed up with [the MLB Reporters] per your request during our initial call." MLB Executive-1 replied, and among other things, noted that "people here are concerned about this as unauthorized access to our systems." MLB Executive-1 also asked "can you let me know the specific amount of money that you want?" The defendant responded, writing, among other things, that when disclosing a network

[4] A "bug bounty" program is a program that rewards individuals who identify vulnerabilities in a computer network or system.

vulnerability "there should be at least some sort of mutual understanding that acting in good faith is encouraged, not discouraged." The defendant requested $150,000 for his disclosure to MLB. He ended his email by writing that "the idea of MLB coming after me for 'unauthorized access to systems' is going to make me lose sleep when it's already at a premium."

## II. THE GUIDELINES RANGE

Pursuant to a plea agreement, the parties agreed that the applicable offense level was 23 and that the defendant was in criminal history category II. This offense level and criminal history category yield a Guidelines range of 51 to 63 months' imprisonment. However, because the offense to which the defendant pleaded guilty (computer intrusion in violation of 18 U.S.C. 1030) has a five-year statutory maximum, the parties agreed that the appropriate Guidelines range was 51 to 60 months' imprisonment. (PSR ¶ 4).

The Probation Department also calculated the applicable offense level to be 23. (PSR ¶ 65). The Probation Department also calculated that the defendant earned one point each from two prior convictions. (PSR ¶¶ 68-69). However, because the Probation Department determined that the defendant had committed the instant offense while on probation, it added an additional two points to the criminal history. (PSR ¶ 72).

The Probation Department therefore places the defendant in criminal history category III and calculated an applicable Guidelines range of 57 to 71 months' imprisonment. (PSR ¶ 112). However, because of the 60-month statutory maximum, the Probation Department concluded that the appropriate Guidelines range is 57 to 60 months' imprisonment. (*See id.*).

## III. A SENTENCE WITHIN THE STIPULATED GUIDELINES RANGE IS FAIR AND APPROPRIATE

A substantial term of incarceration is necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense and to afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a).

### A. Applicable Law

The United States Sentencing Guidelines continue to provide strong guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" — that "should be the starting point and the initial benchmark." *Gall* v. *United States*, 128 S. Ct. 586, 596 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, *see id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). *See Gall*, 128 S. Ct. at 596 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

**A. The Seriousness of the Offense**

A significant sentence, as contemplated by the Guidelines, would reflect the seriousness of the offense, promote respect for the law, and provide just punishment. As to the nature and circumstances of the offense, the defendant's crime was quite serious.

First, the defendant's actions were not simply an isolated lapse of judgment made in a singular moment of weakness. The defendant chose, many times, over the course of years, to intrude into other people's online accounts and use that access to illegally stream copyrighted content. He did it for profit. The crime was sophisticated, it was calculated, and it was brazen. The defendant appeared proud of it—sitting for an *interview* with a well-known technology magazine and bragging about "doing my 'steal from nba league pass shit'" in an online chat.

The defendant points to the sentences of other defendants for online piracy in support of his argument for a below-Guidelines sentence. (Def. Mem. at 11-12). Setting aside the personal characteristics of the other defendants—which must all be considered individually—the nature of the crimes are distinguishable. The defendant here not only engaged in a years-long scheme to sell copyrighted content, he executed that scheme by intruding into the computer networks of others. That is the crime to which he pleaded guilty—Title 18, United States Code, Section 1030. It is not apparent that any of the other defendants cited in the defense submission engaged in

conduct that encompassed not only for-profit piracy, but *also* unauthorized access to computer networks.

The defendant also caused a great deal of harm. MLB alone sustained losses of approximately $3 million from the defendant's conduct. The defendant's conduct also forces the sports leagues to expend a significant amount of time and resources combatting piracy and conducting internal investigations of computer network intrusions. In addition, the defendant also broke into the online accounts of innocent MLB website users. It is a significant violation of privacy—and illegal—to intrude into the online accounts of other people.

In addition, while the defendant was committing computer intrusions of MLB customers and stealing their copyrighted content, he was *also* threatening to expose a computer vulnerability to the press. As detailed in the PSR at length, the defendant repeatedly brought up the specter of the media finding out about MLB's network vulnerability and embarrassing the company. The defendant ultimately demanded $150,000 payment for reporting the disclosure to MLB.

In sum, the length, sophistication and brazenness of the defendant's crimes—in addition to the serious harm caused—warrant a significant sentence.

### B. History and Characteristics of the Defendant and Specific Deterrence

The defendant's history and characteristics weigh in favor of a significant sentence. The defendant has never been successfully deterred from crime, despite sustaining numerous arrests and convictions. His first conviction was at the age of 19 and he is now 31. He has not "aged out" of committing criminal conduct, nor has he taken to heart his prior arrests and convictions.

In November 2010, the defendant was convicted of theft by swindle for selling fraudulent tickets for the Minnesota Twins. (PSR ¶ 68). That conviction did not defer the defendant from crime, and less than a year later, he used another person's credit card information without

authorization to make a purchase. A forensic analysis of his computer then uncovered "44 additional credit cards"—many of which had been closed due to fraudulent activity. (PSR ¶ 69).

The defendant also has a much more recent conviction for disorderly conduct. (PSR ¶ 70). The details underlying that incident are concerning. In November 2020, the defendant was arrested after the police responded to a domestic incident. His then-girlfriend reported that he had assaulted her during a fight. She stated that "Streit grabbed her left wrist and yanked her down to the ground and ripped her watch off of her arm" and "punched her on the right side of the face." When his girlfriend tried to call her mother, he threw her cell phone, shattering the screen. He then "grabbed a large chef's knife and told her to cut and kill herself." (*Id.*).

In addition to those convictions, the defendant has two other arrests for fraud—one in 2009 and one in 2010. (PSR ¶¶ 76-77). Despite those arrests and convictions, the defendant has not been deterred from crime and even appears to revel in his crimes—as discussed above, by sitting for an interview with a well-known technology magazine and bragging about "doing my 'steal from nba league pass shit'" in an online chat. The defendant's simultaneous victimization of MLB through his Illicit Streaming Website and through his extortion attempt also speak to the defendant's brazen and total disregard for the law and for other people.

The defendant points to his autism as an important mitigating factor in his favor. (*See* Def. Mem. at 3). While the Court should, of course, consider all aspects of the defendant in imposing sentence, the defendant should not be permitted to escape accountability for his own choices. The defendant has committed fraud repeatedly, been convicted based on a disturbing domestic violence incident, and stands before the Court after having stolen content from numerous companies and

committed computer intrusion to do it. The defendant must have some sort of reckoning with his own choices.

Even more galling is the fact that—unlike many defendants who face sentencing in this District—the defendant is more than able to earn an excellent living through legitimate work. He could have worked as software engineer and abided by the law. He simply chose not to.

### D. General Deterrence Warrants a Significant Sentence

A significant sentence serves the interest of general deterrence and promotes respect for the law in the public. The defendant caused a great deal of harm. The four major sports leagues invest significant time and resources into creating and distributing their copyrighted content. The content is of tremendous value to the leagues and piracy is a constant and pervasive issue for them. A message must be sent that committing computer intrusions in order steal copyrighted content is a serious crime with actual victims and that the punishment will be commensurate.

General deterrence favors a significant sentence in such cases. *See United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (noting that legislative history of Section 3553(a) supports conclusion that "Congress viewed deterrence as 'particularly important in the area of white collar crime,'" and that "[b]ecause economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence"); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").

## III. CONCLUSION

For these reasons, and all the reasons set forth above, the Government respectfully submits that a sentence within the Stipulated Guidelines range of 51 to 60 months' imprisonment

for this defendant is sufficient, but not greater than necessary, to achieve the legitimate goals of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: /s/
Dina McLeod
Assistant United States Attorney
(212) 637-1040

cc: Jeffrey Einhorn, Esq. (by email and ECF)