UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA, New York, N.Y.

v. 22 Cr. 300 (ALC)

JOSHUA STREIT,

Defendant.

------------------------------x

March 16, 2023
12:00 p.m.

Before:

HON. ANDREW L. CARTER, JR. ,

U.S. District Judge

APPEARANCES

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
BY: DINA Y. McLEOD
Assistant United States Attorney

LAW OFFICES OF JEFFREY LICHTMAN
Attorneys for Defendant
BY: JEFFREY EINHORN

(Case called)

THE DEPUTY CLERK: Counsel, please state your appearances. For the government?

MS. McLEOD: Good afternoon, your Honor. Dina McLeod for the government.

THE DEPUTY CLERK: For the defendant.

MR. EINHORN: Jeffrey Einhorn for Mr. Streit. Good afternoon, your Honor.

THE COURT: OK. Good afternoon.

I want to make sure that counsel received a copy of a letter that was emailed to my chambers late last night. We emailed it to counsel and I know that my deputy printed out copies of it and handed it to counsel. It is a letter from someone who claims to be the defendant's sister, Shea Jessica Streit.

Defense counsel, have you seen this letter?

MR. EINHORN: I have, and I have reviewed it with the defendant, your Honor.

THE COURT: Counsel for the government, have you received this letter?

MS. McLEOD: I have, your Honor.

THE COURT: OK. We are here today to impose sentence in the case of United States v. Streit. In preparation for today's proceeding I have reviewed the presentence report, a consent order of restitution, a submission by the government, a

submission by the defense along with another submission by the defense attaching several letters, and this e-mail that was sent last night.

Is there anything else I should have, counsel for the government?

MS. McLEOD: I believe there were two supplemental submissions of letters by the defendant. There is nothing additional from the government.

MR. EINHORN: That's correct, your Honor.

THE COURT: Yes. I have that.

Anything else from the defense that I should have?

MR. EINHORN: No, your Honor; just noting that there were two supplemental submissions.

THE COURT: To the extent I haven't already done so, I accept Mr. Streit's plea of guilty.

Defense counsel, have you reviewed the presentence report?

MR. EINHORN: I have, your Honor; and Probation has resolved all outstanding objections. I would just note that we plan to discuss the one footnote that Probation put in there concerning the extortion attempt.

THE COURT: Counsel for the government, have you reviewed the presentence report?

MS. McLEOD: Yes, your Honor.

THE COURT: And defense counsel, the footnote that you

are referencing, are you objecting to that footnote or do you just wish to discuss that?

MR. EINHORN: We just wish to discuss it, Judge. I can talk about it during our presentation.

THE COURT: Are there any objections to anything in the presentence report by the defense?

MR. EINHORN: No, your Honor.

THE COURT: Any objections to anything in the presentence report by the government?

MS. McLEOD: No, your Honor.

THE COURT: Then I adopt the factual findings in the presentence report.

Although I am no longer required to strictly adhere to the sentencing guidelines, I must consider the applicable guideline range when imposing sentence. The presentence report sets forth a guideline range of 57 to 60 months. What are counsels' position regarding appropriate guideline range, starting with the government.

MS. McLEOD: As your Honor knows, there was a plea agreement in this case. Probation, as they sometimes do, found an additional two points for the criminal history category based on their determination that the defendant was on probation when he committed the instant offense. That part of the calculation was not part of our plea agreement. Of course, the government is still seeking a sentence within the

stipulated guidelines range which was in the plea agreement. That said, I think that the determination by the Probation Department is accurate in terms of the number of points for the criminal history category.

THE COURT: So what is counsel for the government's view on what the appropriate guideline range that I should consider for this case?

MS. McLEOD: I think probation accurately determined it.

THE COURT: Defense counsel?

MR. EINHORN: Yes, your Honor. I agree. I think Probation accurately calculated the guidelines here and as the government noted, there was a stipulated guidelines range in the agreement which is, of course, not binding on the Court, so the accurate guidelines calculation would govern here.

THE COURT: Based on the lack of objection by the parties, I find that the appropriate guideline range is 57 to 60 months.

I have authority to vary from the guidelines. I have the authority to depart from the guidelines. I will hear from the parties regarding any issues they want to raise about the appropriate sentence. Before I do that, let me let counsel know my thoughts are regarding the e-mail that was received last night. My intention is not to really consider the content of this e-mail. Some of the things that are listed in this

e-mail regarding the fact that Mr. Streit committed this crime at a time even when his mother was sick, some of those other things are already in the record, but this is allegedly from his sister. I'm not sure this is actually from his sister. Assuming this is from his sister, it seems to me that given the sort of family strife that has been evident in the presentence report including the fact that his sister had an order of protection against him that recently expired, I don't think that her comments regarding his lack of remorse to her are particularly probative of anything. That's my thinking on this but let me hear from counsel from the government and the defense on that before I hear from you give your full-throated views on what the sentence should be.

Counsel for the government, anything?

MS. McLEOD: I guess I would just say to the extent that anything isn't particularly, any one thing isn't going to substantially change your Honor's sentence, of course you are free not to consider it. I will say that I think that the letter is likely from his sister and I think it is -- the tenor of the letter, even sort of setting aside whether things are factually accurate, I think the government would agree with the tenor of it in the sense that I think questions of whether the defendant has fully had a reckoning and accountability and things like that. But I agree with your Honor that the sort of specific facts of it may not be particularly relevant because

we will be discussing the same sorts of things based on other things in the record as well.

THE COURT: Defense counsel?

MR. EINHORN: Yes, your Honor. And actually, if I can begin with this first, I don't know if the Court saw Mr. Streit slap himself just a second ago. Part of his condition is he engages in stiming, which is common in the autism community, and he moves around quite a bit. I don't want the Court to be offended, that's part of his condition.

With regard to the letter, I have to say I was surprised to receive it before walking into the Court. I don't know how the defendant's sister could, if that is from his sister, how she could determine, after not speaking with him for two years, as to what his intent or remorse is at this point. It seems to me like it is kind of neither here nor there, but I will say that this is obviously a very dysfunctional family. This is an individual who we know to be bipolar, if it is in fact from his sister, and it is someone who must have an extreme distaste for the defendant to go to the great lengths of writing the Court on the eve of their brother's sentencing to try to turn the Court against him, if that was her intent.

THE COURT: So, let me hear from counsel regarding any issues they want to raise about the appropriate sentence and I will give Mr. Streit an opportunity to address me, if he would

like. Let me hear from defense counsel first.

MR. EINHORN: Thank you, Judge. Should I stand or sit?

THE COURT: Doesn't matter to me.

MR. EINHORN: OK. Your Honor, we are going to rely privy heavily on our sentencing submissions here. Our submissions, as the Court noted, we put in three separate submissions; one primary and two containing what I think to be quite wonderful sentencing letters. I can't remember the last time in 15 years of practice that I had to submit not one but two supplemental submissions to the Court, and further, that that second submission just contains so many additional letters. And this isn't a situation where I reached out to Mr. Streit after I filed our submission and said, hey, we need some more letters, it is not looking so great, which is something, frankly, I have had to do before. These letters, at this point, basically unsolicited from individuals, who just sent them to my office and I collected them after filing my submissions to provide them to the Court. And I think the most telling of those, frankly, is the letter that came from the defendant's fiancee, who is seated in the audience. And I know the government made a great point in their submission about the domestic violence conviction for Mr. Streit that occurred in 2020 and the fact that he was still having issues with the law right before his arrest in this case but at the tail end of his

conduct. And as the defendant's fiancee says, the conviction was almost completely a setup but, more importantly, that she was a major alcoholic and was basically running out the door with the car keys to drive drunk and he stopped her. So I think as far as the letters are concerned for me, that one is really paramount here and that's not a letter -- that was a supplemental letter, and it is not one I reached out to her and said, hey, can you explain this again? It just arrived at my doorstep and I provided it to the Court. And the fact that it came right after the government's submission for the defense was somewhat serendipitous, I would say. It doesn't usually happen that way.

Judge, to go back just a little bit, though, as far as the conduct is concerned, and we don't want to find ourselves debating facts, but as far as the conduct at issue, the government kind of made it sound like Mr. Streit was going in and breaking into people's computers, the users of MLB accounts' computers and breaking into the MLB computers or servers and then just streaming this content out to all of these individuals. That's not what occurred here. What occurred is that Mr. Streit, by multiple log-ins, like five or six at a time, used them and logged into those purchased log-ins which obviously were stolen or fake, and he would log in on his home computer and he figured out a way to facilitate the streaming from MLB. But it is not like he was hacking

directly into the users' computers to steal their credit cards. That is not what occurred here. What occurred is really just taking the material from his computer and streaming it off to many different people, a lot of different people, who paid $100 a season. It is criminal, it is a crime.

THE COURT: Can you give me further elucidation on this difference? It seems like this may be a distinction without a difference. The log in is -- this information belonged to other people, didn't it?

MR. EINHORN: Of course, Judge. I think for me it is the concept of him logging into one computer at a time to steal login information from individuals who were the customers of MLB and that, at least according to me, it appears to be more insidious than purchasing a login and using it. It is like using someone else's Netflix account. These are people who didn't know their accounts were being used and that is complete theft.

I just wanted to paint the picture of what this looked like when he was committing this crime. That's all. For him to have done this over and over again, to hack into users' computers to get their information would, one, be extraordinarily time consuming; but two, it is just not what occurred here, it doesn't look like that.

THE COURT: He is still using the login information that belonged to other individuals?

MR. EINHORN: Which is a crime, Judge.

THE COURT: And he is doing it several times with -- is your distinction that you are making is that he is doing this with multiple individuals' log-ins instead of just a set few log-ins? Is that what you are saying the difference is?

MR. EINHORN: I think that's the case, Judge. When I got into this case I was under the impression initially that he was taking hundreds, if not thousands, of individuals' identities and using them but it was really just a handful at a time, their log-ins.

THE COURT: And why is this good?

MR. EINHORN: Only because I think it paints a picture of what actually occurred here, that there weren't thousands of individual account holder victims but really just a handful. It doesn't necessarily make the crime look any better, I am trying to paint a picture of what occurred here for the Court and I can move on, if it helps.

THE COURT: OK. Go ahead. Again, he used that information to stream this content from these sports leagues and then charged people for it.

MR. EINHORN: Which is a crime and we are not here to get any awards or medals here today, we are aware of that. I am trying to paint a picture for the Court of what it looks like here.

THE COURT: OK. Go ahead.

MR. EINHORN: The other issue that I took with the government's sentencing submission was their description of the extortion attempt. And it is not something that Mr. Streit pled guilty to but it is something that the government has brought up in their submission and I think we have to address it now.

There are e-mails -- this whole extortion attempt, most of it occurred by e-mail and I just, again, for the Court's consideration, what initially occurred here wasn't a situation where Mr. Streit found bugs in the MLB or Tickets.com website and said, hey, you guys need to give me $150,000 or I'm going to tell the media what you guys did wrong. Instead, I will actually read what he wrote. This an e-mail, Judge, the first e-mail to MLB:

I'm a security researcher and Twins season ticket holder. I found a bug that's bound to be of interest to MLB and Tickets.com. I would like to make this disclosure responsibly. I wasn't able to find such contact information online. Could you help?

That was March 16th, 2021.

THE COURT: And that same e-mail that you just read, would you characterize that as a lie?

MR. EINHORN: No, I don't think so, because the next day your Honor, he follows up with the second e-mail where he actually just provides the bug information. This is before any

discussion of money. He tells them what the issue is.

THE COURT: But the statement is implying that he is trying to do something out of generosity, out of the kindness of his own heart, and that's not what's going on here.

MR. EINHORN: I think initially that is what was happening at first because he followed up that e-mail with a second e-mail, and I have copies for the Court, if the Court would like to review them, but he followed up with a second e-mail where he actually provided the bug information free of any charge. If he wanted money, he would have demanded it first.

THE COURT: Is this in March of 2021, this first e-mail that you are reading?

MR. EINHORN: Yes, Judge.

THE COURT: At that same time wasn't he already using the login information of other people and streaming MLB's content and charging people for it?

MR. EINHORN: Judge, just so we can be clear, I think this is somewhat confusing in the government's submission. What occurred with the extortion attempt has literally nothing to do with streaming material.

THE COURT: Well, yes, it does, because that's what why I am saying. It seems to be what you read before was a lie because you are saying maybe he is a Twins season ticket holder but stating that he is a Twins season ticket holder and that he

is a concerned citizen is, to me, a lie in the context of the fact that at the time that he is sending this e-mail, he is stealing MLB's copyrighted information and selling it to other folks.

MR. EINHORN: Understood, Judge. I just want to make clear for the record that, again, the streaming crime involved streaming of information, of content. This had nothing to do with streaming content, he was just able to log in to other people's tickets. He determined a vulnerability and he found that someone could take his own tickets and he alerted them to it. That was it.

THE COURT: OK. Go ahead.

MR. EINHORN: OK. Judge, the other thing I want to bring up here, and I know that we talk about it in detail in our submission, is the defendant's medical condition. This is an individual who was diagnosed with autism in 2022.

THE COURT: Wait. Before you go on, I'm sorry, I may have cut you off there. Is there more that you wanted to talk about in terms of this extortion? Did you want to get to what happened in September 2021 with this extortion attempt or you didn't want to discuss that.

MR. EINHORN: Judge, I'm happy to discuss it.

What happens is they basically e-mail back and forth and then drop the ball and they don't bring anything up for two months and he is upset. He says, look, I want to talk to the

media or someone about this to make sure it is done and at the same time he asked for the money. But we are not saying there wasn't an extortion attempt here, we are not having a hearing on that. I literally just wanted to paint the picture that his initial reach-out to MLB, one, gave them the vulnerability, told them about it; and two, was done I think somewhat innocently. And I understand the Court looks at it differently. But again, if he had wanted that money first, he would have demanded the money before telling them what the bug is but instead he gave them the bugs, there were eight, and he does that by e-mail.

THE COURT: I don't understand -- I guess I understand what you are saying. I guess I don't agree with what you are saying. It seems to me that what he has been engaged with here in this case is fraud, deception, and he has been behaving like a con artist. And his prior convictions, putting aside the disorderly conduct, deal with him, again, engaging in fraud and being a con artist and these things that you are talking about, to me, in terms of not asking for the money right up front. That's how cons work. You don't ask for the money right away; you set the hook, you wait, and then you ask for the money later. This information that you are talking about in terms of this deluge of letters that you received, I have no doubt that he has done good things in his life but I also have no doubt that he is charming because it is very difficult to be a

churlish con artist. You have to be charming, you have to be polite in order to be able to perpetuate these types of frauds. But, go ahead.

MR. EINHORN: Judge, moving on to the defendant's autism, which is something that we talked about, we provided two evaluations in our submission, one from William Tenbrook which is the second exhibit, and I would point the Court to that because I think more than anyone else who has dealt with Mr. Streit, they're familiar with his condition, that he has persistent deficits in social communication, social interaction across multiple contexts. He struggles with sounds, noise, textures regarding foods, he doesn't like touching things, and he has difficulty interpreting what others are thinking or feeling. This isn't a scam, your Honor, this is a real medical condition. Autism falls under the ADA, this is a very real medical condition, and I am sitting here watching the man shake next to me and stim. It is not a hoax, your Honor.

Additionally, according to Mr. Tenbrook, Mr. Streit is at a crucial point in his developmental cycle with regard to this autism, and if he is not able to continue either some type of weekly therapy or other therapy, he is going to require a higher level of care and it is going to get a lot worse and we know that.

In addition to the autism, Judge, we know that he also suffers these amnesia spells, one is this epileptic amnesia and

the other is transient global amnesia. And I think what is most scary about them is that these are already occurred while he is in custody, once when he was at the halfway house and once following his arrest and guards simply didn't believe that he had this. The man falls to the ground when it occurs and he doesn't know where he is. Again, it is going to be much more difficult because of the autism and because of these conditions for him to serve a period of incarceration versus any other person. And I'm not saying he deserves no incarceration, I am just saying that that is a factor I think the Court should consider in imposing any period of incarceration.

Judge, on top of the defendant's medical condition, I would point again to his troubled childhood. He was raised by an alcoholic and emotionally-abusive mother. She passed away, as we know, due to brain cancer, and the defendant was there with her to the end. He had a physically abusive father. We know that the police came to the house once because the mother fell down the stairs. We know that the defendant, his ribs were broken by his father once. I don't need to put this out loud but we know about the incident with the priest that we informed the Court of. This is someone who had a very troubled childhood and doesn't make up for all of these crimes later but I am just putting all the information out for the Court to consider.

THE COURT: Can you tell me, is there any link between

this abuse -- and I don't want to minimize that, and this crime? I understand, certainly, people who have suffered abuse frequently will come to courts and ask for leniency, certainly the first time that they get arrested, maybe even the second time, but this isn't the first time that he has been convicted of a fraud-related offense and it is not the second time either -- and he just turned 32 years old. I'm not trying to minimize the abuse that he suffered but it seems that at some point there is an expiration on when you can use that when it's your third fraud-related conviction and you are 32 years old.

Can you please explain that for me a little bit?

MR. EINHORN: Judge, I think it is very simple. I think people who are marginalized in society when they are very young have issues later on. And I do understand that he has multiple arrests, I do understand that, but this is not a situation where the defendant is coming here, as I have had before, even with your Honor, where the defendant, who has had multiple federal sentences and has served lengthy periods of incarceration and I am coming back saying, well, doesn't it help this time that he had has a troubled childhood? This is an individual who, at most, has served 15 days in jail at this point so I do think there is a distinction. There are people who are Criminal History Category IIIs who have major federal convictions and there are people who have had relatively minor incidents -- I'm not downplaying because they're all related,

it is all fraud -- and coming to the Court for their first major federal case.

THE COURT: I think he served about 99 days in jail at the least on one conviction. He got nine days originally and then he violated probation and got 45 days, and violated probation again and got another 45.

MR. EINHORN: Your Honor, I think some of it actually was suspended at the end of the day. According to Mr. Streit it was a lower number. And again, as he told probation about the violations, the violations were largely for not responding to his probation officer when he was with his mother in the hospital and staying with her and not getting mail. I understand there is always an excuse for everything, I do understand that, but I am trying to paint the picture for the Court that there are relatively low, minor issues that really snuck up here as far as his criminal history and then this case which is a completely different magnitude. So at this point to talk about his childhood and how it may have impacted decisions here, I think they're relevant. On top of that, we have a diagnosis for autism which we know impacts all of this which is very recent: 2022. 2022, after this conviction -- sorry, after this arrest. This is something we are finding out now.

So, if the Court needs me to point to something different about him now than before, it is that he is actually receiving weekly treatment for this condition and this

condition, which doesn't just cause him to move about like this, but the way he interprets the world around him.

THE COURT: OK. Go ahead. Continue.

MR. EINHORN: OK. Judge, I don't need to go into character letters. I think largely they speak for themselves. Again, they are beyond touching and I don't think they're the fraud of after someone who tried to defraud everyone, because they come from so many different individuals that he worked with at his employment. If it is fraud to con them by helping him, then I guess he conned them but he did this for a very long time as an employee; he helped many people, he built teams. He apparently took on the work of many people and he did it himself. If that is him trying to con people, then I would like to have some employees who are like that as well because I think I could get more done.

The only last thing, your Honor, would be just to note for the record, that he did spend 194 days in a halfway house in this case on pretrial release, which is something he is not obviously going to get credit for by the Bureau of Prisons, and it is somewhat odd in my experience coming from this district, but it is something that occurred as part of his release initially in Minnesota.

That's it, your Honor.

THE COURT: Let me ask defense counsel another question then. You just mentioned the letters from his

employers and co-workers. It also seems to me that it is particularly troubling that during the time that he has engaged in this conduct he was working consistently and at one point in time he was making -- he was at a job with a salary of $160,000 and another time he had a job with a salary of $190,000 and he still engaged in this conduct, and it seems to me that this conduct is all about greed and it seems to me that that makes this even more egregious, that he had high-paying jobs, didn't need to do this, and stole this information from individuals and stole copyrighted information from large sports leagues.

Can you talk about that?

MR. EINHORN: Judge, I find it to be troubling as well and I don't think this is a situation, if he was making a decent salary and this is someone who lives in the midwest where the cost of living is significantly lower, as we know, I don't think that this was something that was done for the money then. This is an individual who has not lived a very high-flying lifestyle. He has lived a fine lifestyle but it is not an individual who lives in a giant mansion.

THE COURT: Doesn't he have a Porsche?

MR. EINHORN: He does have a Porsche. He has a beige Porsche Cayenne. I believe according to the PSR he bought it, he paid $40,000, it was an SUV. But that being said, your Honor, I can't square that away, that he was doing this at the same time, only to say that I don't think it was done for the

greed. I think that when you look back at the letter of Will Tenbrook, which explains how this condition affects him, how it causes him not to understand societal norms. It doesn't make him not guilty of crimes but as far as what he was understanding at the time and not that he didn't know it but if he didn't grasp it, what actually was occurring. And I don't think this was done for the money, I think this is someone who got stuck in a loop of trying to make something work. I don't know why it was monetized because it was monetized. I have no explanation, Judge.

THE COURT: And the extortion attempt, asking for $150,000, wasn't about money?

MR. EINHORN: Judge, bug bounty programs are rampant and common in every corporate field. People call these offices all the time and say, hey, we found this issue, can you pay us. Asking for money because of it is actually not uncommon.

THE COURT: I didn't say asking for money, I said asking for $150,000.

MR. EINHORN: My understanding from the defendant, your Honor, is that he used a fairly normal industry calculator because there is a whole industry behind bug bounty programs. He found eight bugs and it is based on the number of people who are potentially affected.

THE COURT: OK. Thank you. Let me hear from the government.

MS. McLEOD: Briefly, your Honor, I'm going to go through some of the factors and respond to a few things that defense counsel raised.

First to start with the nature of the offense. I think your Honor is fairly attuned to what the crime was here and why it was serious. What this amounted to was a very sophisticated, years-long scheme, which involved both intrusions into regular people's online accounts and then using that, committing that crime in order to commit the other crime of streaming -- essentially stealing property that belonged to these major sports leagues, any one of which is troubling. Of course, the defendant did it for profit and I think one of the things we noted in our submission, and your Honor also pointed out, was this is particularly concerning, especially when thinking of specific deterrence because the defendant has the ability to earn a good livelihood. He has, unlike many people who face sentencing in this district, he is educated, he has a lucrative professional background being a software engineer. He easily could have lived a perfectly good life in Minnesota doing legitimate work and he chose not to. And he chose not to over many, many years. And what I think is among the more galling things and one of the things I think speaks to the defendant and sort of where he is in terms of taking accountability, the defendant gave an interview, an anonymous interview to a well-known technology magazine where he is

essentially bragging about all of the stuff that he is doing. There is a brazenness there. He brags about it in his online chat to an undercover of how he wants to steal NBA League Pass as he has been doing for the past five years. And when we talk about the extortion attempt, in paragraph 36 he complained to the Major League Baseball employees, he said the lack of gratitude is frankly shocking, from MLB to him. And again, I think this gets to your Honor's point about this is in the context of him simultaneously victimizing MLB in a different way and him coming to them and say that they don't have enough gratitude towards him. The entitlement there I think is really concerning, and I think, to your point, you know, this isn't -- I don't want to get into the details of a bug bounty program but MLB told him we don't have one, that means we don't pay out for this kind of stuff. So I think the simultaneous nature of it is what really, sort of the synthesis of those two things are what really makes it really troubling.

In terms of the defendant's history and characteristics, I think as your Honor noted, he has a long track record of -- he has multiple convictions, he has multiple arrests. His frauds, when you read the narratives in the PSR, are con-type frauds. They are situations where he is manipulating people, he is defrauding people, he is being deceptive. I'm not going to belabor the point about the disorderly conduct conviction, I think your Honor can assess

that on its own terms. I will just note, though, that the victim in such cases recanting is an unfortunately familiar dynamic that I think people who have worked in the criminal justice system have seen many, many times.

I will just touch briefly on the autism point because I am not sure that it's a mitigating factor. I'm not sure that it is aggravating, I just don't know that it has any connection at all to the crime.

So this isn't a crime where the defendant stumbled into the fraud because he didn't pick up on social cues. That's not what happened. The defendant engineered a very sophisticated scheme that had nothing to do with, *"I can't pick up what someone is telling me."* In fact, I actually -- I spoke with the MLB executive recently who was the second person -- he is the person, who is MLB Executive-1 in the PSR, and I was talking to him about the sentencing and he told me that the defendant was very sophisticated on the phone. He talked to him multiple times on the phone about this, he said he was very sophisticated, very business like, he was very savvy. He said I could not detect any challenge that he had. And he said it was like talking to one of my -- he is one of the top executives at MLB, he said it was like talking to one of my extremely strong managers, so another supervisor under me speaking to someone who is savvy at that level was the dynamic of that conversation. So, the social cues issue certainly

wasn't impeding him in that, those conversations, so I just don't know that there is a strong enough nexus there to suggest that it is mitigating.

Unless your Honor has any other questions, I think I have made my main points.

THE COURT: I guess in terms of what the government just stated, my sense of what defense counsel was trying to say, although he went into some other areas as well, regarding the autism, is that it is a mitigating factor in terms of how it will affect the defendant in prison, that the failure to respond to social cues and the like could make his prison sentence more difficult than it would be for someone who didn't have those issues. I believe that was the primary part of what he was saying but I do recognize that defense counsel also did sort of vaguely make a reference to the autism and his -- and this not being about the money, and because of the autism it affected his engagement in this crime but I will ask defense counsel. I don't believe that defense counsel is taking the position that the defendant was not aware of the consequences of his actions or that the autism led him to commit this crime, or are you?

MR. EINHORN: No, no. It is exactly as your Honor said. I'm not saying that the autism caused him not to understand the repercussions of his actions or not to know that he was committing a crime at the time. I think that it played

in probably to how things went down. One of the things we know --

THE COURT: I got that, I got the verification from defense counsel, let me give the government a chance to respond if there is anything else you want to say about that before I hear from defense counsel more on that?

MS. McLEOD: No, and I think your Honor's point is fair and accurate. I think I picked up on the defense counsel noting something in a letter about societal norms and things like that as gesturing in that direction but I take your Honor's point as to the other reason why it could be mitigating.

THE COURT: OK, thank you. I will hear from defense counsel.

Anything else you want to say about that?

MR. EINHORN: Just one quick thing.

I know that the government mentioned Mr. Streit's communications with Executive-1 from MLB and the executive's comment somehow about how he was high-functioning. This is actually addressed in Mr. Tenbrook's letter about Mr. Streit. He says that he is exceptional with regard to his ability, one, to hide, and two, to speak, but it doesn't affect his interpretation or how things went down but I don't think that the autism is an excuse for the criminal conduct but that is not our point, Judge. Our point, merely, is that he will have

a more difficult time in prison than non-autistic people.

THE COURT: Let me give defense counsel a quick opportunity to respond to what the government brought up regarding sort of the need perhaps for general deterrence in terms of the brazenness of the defendant going on this other platform and anonymously bragging about his conduct. It seems to speak to a need for general deterrence but let me hear from you on that.

MR. EINHORN: Or specific deterrence, Judge. I think perhaps it can go to both. There is nothing I can say. That was not something that certainly helps his case whatsoever. Obviously, speaking to a reporter under the guise of a pseudonym does not -- none of this excuses any of his conduct and certainly doesn't help him at all, Judge. I would only say that all of this occurred before he started attending therapy for the autism and started to get his mind in order.

THE COURT: OK. And is it Mr. Streit or Streit?

MR. EINHORN: It is Streit, your Honor.

THE COURT: Streit.

MR. EINHORN: Streit.

THE COURT: Mr. Streit, I will give you an opportunity to address me if you would like. You don't have to say anything but if you want to I will give you that opportunity now. Now, Mr. Streit, I see you standing to show respect for the Court. While I appreciate that, the acoustics here aren't

great, so why don't you have a seat and that way you can speak directly into the microphone and I can hear everything you have to say.

THE DEFENDANT: Your Honor, I am not here to -- I am here to not only acknowledge my atrocious act in judgment, but take full and complete responsibility for it. I have not only violated the law but I caused strife for the institutions concerned, for all involved, including the victims and this Court. I realize that my actions not only damaged my life but negatively impacted the victims, consumed valuable resources from them and yourself, the district attorney and their office, and the greater resources of the government. All of which I have great and sincere appreciation and respect for.

As a side effect, this has negatively impacted those who love and look up to me for my integrity and honesty which is an action that, in and of itself, should be considered a crime. My sentence here, no matter how severe, will be one that will be for the rest of my life.

To the victims, I cannot apologize enough for my actions that brought me to stand before you today. I was fully aware of the harm that I caused my victims and I deeply regret that my poor choices in judgment in regards to them and I am fully prepared to accept the consequences that they will bring. And I understand that I, alone, am responsible for what happened, and as a result I am committed to making amends and

what is part of my true character is to make sure that I make amends that are above and beyond what is normally expected.

I have long sought answers to better understand myself and I have felt many pains which I did not understand were even pains, and I felt sorrows which I did not understand were sorrows, I have felt emotions I could not understand or recognize or interpret, and I also have listened to sentences which I could not interpret or parse. I have found myself in situations that no dream nor nightmare could reasonably describe, predict, or transcribe, and in April of 2022, after a conversation with a friend who is familiar with autism, I was led on a journey to explore a diagnosis which I later then received.

I often regarded so many things about myself that were unexplainable and in August of 2022 I found a semblance of a living miracle in that of my therapist Will Tenbrook and with the people of Mr. Tenbrook I began to heal and understand the sentence that I was born into. A week ago I turned 32 years old and I am at an age where most of the guys are laying down their foundations or building upon existing ones for which they will live the rest of their lives. And families start to form, fathers become grandfathers, and mothers become grandmothers. And I understand that the consequences for my actions may put me into a hole which may be difficult to climb out of and I accept that because I deserve it, but I have spent a lifetime

of searching for answers to many of the questions and many of the pains I have faced over the years, and some of which have greatly clouded my judgment for which I otherwise believed to be good. Appearing from understanding society and its norms, interpersonal and intrapersonal relationships, workplace dynamics and indescribable fears from such normal things like lights and doors and foods and textures, I am a fearing person that fears the world around them and sometimes that makes my judgment really difficult to understand, and for these pains I finally only received an answer a year ago and my healing has only just begun with the help of my therapist Mr. Tenbrook

After my experience in the criminal justice system as a young adult I had a long conversation with my mother, who reported to me that she never wanted to see me go through it again. At that time I was someone with no self-esteem and no self-worth and my goal was simply to make it to the next day. I didn't have any pride and I didn't have any direction. What I did have was curiosity and I pushed through and I taught myself software engineering which I thought of as a marketable skill today where I am a standout amongst my peers. I thought about myself in cybersecurity and I took a pledge of ethics to make the Internet and world a safer place for consumers and businesses alike. And despite the levels I have maintained in my career, by being here before you in this court means that I have failed my friends, I have failed my colleagues, I have

failed my family, and most importantly I failed my mother.

After incarceration I hope to continue my autism therapy with Mr. Tenbrook, if they are willing to have me, as just in the last seven months of this programming and therapy I have learned more about myself than I did in those previous 377 months.

I hope to be able to continue with my career and employer as they have created a safe environment for me and the support system that has allowed me to truly thrive despite my special needs. I hope to continue to be a positive influence to those around me as I have always tried to be that includes my closest friends, to people I have only known for a moment in time, and use my experience here as an opportunity to growth. No matter what happens here and in the future, I am committed to not doing anything that would ever warrant entering your courtroom again, save for a marriage license to my beautiful fiancee who is here to support me today.

I cannot, in good faith, make any excuse for any single one of my actions which resulted in me being here today, and no matter what I believe my character to be, I will always know my choices alone are the reason why I am here. And, to the victims, again, I am so sorry for those choices and my judgment. I am sorry. That's all.

Thank you, your Honor.

THE COURT: Thank you.

Is there any reason sentence should not be imposed, counsel for the government?

MS. McLEOD: No, your Honor.

THE COURT: Counsel for the defense?

MR. EINHORN: No, your Honor.

THE COURT: Mr. Streit, are you satisfied with your legal representation up to this point?

THE DEFENDANT: Yes, your Honor.

THE COURT: I have considered all the factors in 18 United States Code 3553. I have the authority to depart from the guidelines. I have the authority to vary from the guidelines.

First, I have before me a consent order of restitution which appears to be signed by Mr. Streit. Did you sign this today in court, Mr. Streit?

THE DEFENDANT: Yes, your Honor.

THE COURT: And before signing it, did you read it?

THE DEFENDANT: Yes, your Honor.

THE COURT: Did you discuss it with your attorney?

THE DEFENDANT: Yes, your Honor.

THE COURT: Do you understand it?

THE DEFENDANT: Yes, your Honor.

THE COURT: And by signing this consent order of restitution, do you consent to an order of restitution in the amount of $2,995,272.64?

THE DEFENDANT: Yes, your Honor.

THE COURT: I will sign off on this consent order of restitution and I will order restitution in that amount. I will impose the $100 special assessment. I will not impose a fine in light of the amount of restitution that has been imposed.

What is the government's position on forfeiture?

MS. McLEOD: Your Honor, there was a consent preliminary order of forfeiture at the time of the plea so that just needs to be finalized. I'm not sure if your Honor signed it then but we, the parties, signed it at the time.

THE COURT: OK. And what is that amount?

MS. McLEOD: I believe it is $500,000.

MR. EINHORN: $500,000, Judge.

THE COURT: Hold on a second. All right, I will enter restitution in the amount of $500,000.

MS. McLEOD: Forfeiture.

THE COURT: Forfeiture. I'm sorry. $500,000 in forfeiture. I will enter an order of forfeiture in the amount of $500,000. Anything else from the government regarding forfeiture?

MS. McLEOD: No, your Honor.

THE COURT: From the defense?

MR. EINHORN: No thank you, your Honor.

THE COURT: In terms of custody, as I indicated, I do

have the authority to vary from the guidelines. This is a very serious offense and the defendant committed this offense in a very brazen manner, bragged about doing this, and also tried to extort one of the institutions that he was stealing copyrighted information from. He has a prior record for engaging in fraudulent activity. The guideline range is 57 to 60 months. I believe that a sentence within that guideline range is greater than necessary to meet the goals of sentencing. I will vary from the guidelines based on Mr. Streit's medical situation. I do find that his autism and other medical needs will make his incarceration more difficult than it would be for a typical defendant who would be sentenced and I will vary from the guidelines and impose a term of incarceration. I also find that where we are with the COVID-19 pandemic, although things are better now, that in the future it is likely that the term of incarceration is also going to be greatly impacted by lockdowns and such, occasioned by new outbreaks of the COVID-19 pandemic, so I will impose a term of custody of 36 months, to be followed by three years of supervised release.

Regarding the conditions of supervised release, I will impose the mandatory conditions as set forth in the presentence report; the standard conditions as set forth in the presentence report; the special condition that he provide the probation officer with access to any requested financial information and that he not incur new credit charges or open additional lines

of credit without the approval of the Probation Officer, unless he is in compliance with the installment payment schedule. I will impose a special condition that he participate in outpatient mental health treatment program approved by the United States Probation Office also as set forth in the presentence report.

In light of this offense, I will also impose the special condition that he submit his person and any property, residence, vehicle, papers, computer, other electronic communication, data storage devices, cloud storage or media, and effects to a search by any United States Probation Officer and, if needed, with the assistance of any law enforcement. The search is to be conducted when there is reasonable suspicion concerning a violation of a condition of supervision or unlawful conduct by the person being supervised. Failure to submit to a search may be grounds for revocation or release. He shall warn any other occupants that the premises may be subject to searches pursuant to this condition. Any search shall be conducted at a reasonable time and in a reasonable manner. He should also be supervised by the district of residence.

Are there any open counts?

MS. McLEOD: There aren't, your Honor; no.

THE COURT: I have sentenced Mr. Streit to a period of incarceration. Does the government have an objection to

setting a surrender date?

MS. McLEOD: No, your Honor.

THE COURT: So let's set a surrender date. Approximately four months from now? When would that be, Tara?

THE DEPUTY CLERK: July 17th.

THE COURT: So let's set a surrender date of July 17th. If there has not been a designation into a facility by then, then on July 17th, at 10:00, Mr. Streit should surrender to the nearest marshals office in Minnesota where he resides.

Anything else before I advise Mr. Streit of his statutory rights to appeal, counsel for the government?

MS. McLEOD: No, your Honor.

THE COURT: Counsel for the defense?

MR. EINHORN: Your Honor, just one brief thing; a recommendation that he be designated to a facility close to his hometown.

THE COURT: And what hometown is that? What is the name of the hometown in Minnesota?

MR. EINHORN: In Minneapolis, Judge.

THE COURT: Any objection to that by the government?

MS. McLEOD: No, your Honor.

THE COURT: I will recommend that the Bureau of Prisons incarcerate Mr. Streit in a facility close to Minneapolis, Minnesota.

Mr. Streit, you have a statutory right to appeal.

There are time constraints on your ability to file notice of appeal. You should talk to your attorney about that. If you cannot afford to hire an attorney to help you prosecute the appeal, the Court will give you an attorney free of charge.

Do you understand?

MR. EINHORN: Yes, your Honor.

THE COURT: We are adjourned. Thank you.

o0o